a

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| ANTHONY PAUL JOHNSON #600482, Plaintiff | CIVIL DOCKET NO. 5:19-CV-00209 SEC P |
| VERSUS | CHIEF JUDGE S. MAURICE HICKS, JR. |
| DARREL VANNOY, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

### REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1), and an Amended Petition (ECF No. 7), filed by *pro se* Petitioner Anthony Paul Johnson ("Johnson"). Johnson is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Johnson challenges his conviction and sentence imposed in the First Judicial District Court, Caddo Parish.

Because Johnson's insufficient evidence claim is procedurally defaulted, and because he fails to establish a *Batson* violation or an ineffective assistance of counsel claim, Johnson's Petition (ECF No. 1) and Amended Petition (ECF No. 7) should be DENIED and DISMISSED WITH PREJUDICE.

1

## I.    Background

According to the Louisiana Second Circuit Court of Appeal:

In the early morning hours of August 30, 2008, two individuals fired multiple shots from assault rifles into a residence at 3134 Lillian Street in Shreveport. At the time of the shooting, several residents were asleep in the home, including a 17–month–old child, L.A., who was struck in the chest by a bullet while he slept in a playpen. The child died as a result of the wound.

After the shooting, the police recovered 23 assault rifle shell casings from an alley behind the house. Multiple bullet holes were found in the walls of the house, including in the living room, where L.A. had been sleeping. Police investigators learned that before the shooting, there had been a fight between Travarrius ("My Pooh") Adams and Marcus Jackson because they were both interested in the same girl. The fighting between these two and their friends had escalated to the display of weapons and gunfire. [Johnson] was an acquaintance of Marcus Jackson and had been seen holding a rifle some hours before the shooting. After the police investigation, [Johnson] was arrested and charged with second degree murder.

The factual situation was presented through trial testimony. Ronnie Taylor testified that he was a friend of Travarrius Adams and that on a prior occasion, when they were walking home from school, shots were fired at them by Darrius Williams, Marcus Jackson and his brother, Mario Jackson. Taylor stated that on the evening before the shooting, he had attended a high school football game with Adams. Taylor testified that while walking home alone afterwards, he was stopped by Mario Jackson, Darrius Williams and [Johnson], who were all riding in a vehicle. Taylor stated that they spoke briefly and he saw that [Johnson] was holding a "chopper," which Taylor said is slang for a machine gun. On cross-examination, Taylor stated that [Johnson] did not point the gun at him.

Shadominique Randall testified that in the early morning hours of August 30, 2008, she was at the Shreveport home of Mario and Marcus Jackson, who were present along with Darrius Williams and [Johnson]. She stated that she saw three "long guns" in the living room and that Darrius was playing with one of the guns. Randall testified that Darrius, Mario, [Johnson], and herself left the house and were driven to Bossier City in the vehicle of Tomtieja Bates. After returning to Shreveport, Bates drove to Lillian Street and parked the car near an

alley.  Randall stated that [Johnson], Mario and Darrius then left the car and ran across the street to the alley, leaving her and Bates in the vehicle.  Randall testified that she did not see the men with guns because it was dark outside, but after they went into the alley she heard gunshots. Initially, Randall stated that when the men returned to the vehicle, she did not see [Johnson] with a gun.  However, after being shown her prior grand jury testimony, Randall recalled that upon returning to the vehicle after the gunfire, [Johnson] was carrying a long gun.

Antonia Reed, the mother of the victim, testified that she lived at the residence with Legary Adams, the older brother of Travarrius Adams. She stated that Travarrius sometimes slept at their house, but he was not present the night of the shooting.  Reed stated that she was awakened by a loud noise and that she and Legary then rushed to check on their children.  Reed testified that bullets were fired into the living room, where the victim was sleeping in a playpen that night.  Reed stated that when she saw the child, he was unconscious and bleeding. The child did not respond to the CPR efforts of Shreveport Police Corporal Jeremy Edwards, who had arrived at the scene of the shooting.

Richard Beighley, the firearm section supervisor of the North Louisiana Crime Lab, was accepted as an expert criminalist with specific expertise in firearms identification. Beighley testified that the lab received 19 fired 7.62 x 39 caliber shell casings, which were all the same brand of Wolf ammunition.  Beighley opined that 15 of the shell casings were fired from the same weapon, a military assault rifle.  Beighley stated that there may have been a second rifle fired because four shell casings were not definitively matched, but that he could not be certain.

Dr. James Traylor, an expert in forensic pathology, performed the autopsy on L.A. and testified that the cause of the child's death was a "single, through-and-though gunshot." In description, Dr. Traylor stated:

> The entry was to, just below the level of the left nipple, and then came out just right at the midline over the right side of the back. And in passing from the entry to the exit caused some damage to the heart, ... the thoracic aorta, the part that's contained within your chest, and then passed through into the abdominal cavity, caused some injury to the left lobe of the liver and ... caused injury to the spinal cord before it came out.

Dr. Traylor explained that as a result of the wound, the child bled to death.

Mario Jackson testified that on the night of the shooting he had been a passenger in Bates' vehicle with Randall, Darrius and [Johnson]. Jackson stated that the guns were located in the trunk of the car. Jackson testified that Darrius had said that "he wanted to kill someone" and suggested they "go to My Pooh's house." Jackson stated that he, Darrius and [Johnson] got out of Bates' car on Lillian Street and grabbed the guns. Jackson stated that he walked across the street with them, but then turned around in fear. He testified that Darrius and [Johnson] continued walking into the alley with cocked guns. Jackson stated that he then heard about 30 to 40 gunshots and that he could tell two guns were fired because "one was louder than the other one." Jackson testified that after returning to the car, [Johnson] said that his gun had jammed while firing. Jackson stated that they all drove back to his house and that [Johnson] left with a gun. On cross-examination, the defense counsel highlighted Jackson's grand jury testimony that [Johnson] had not said anything after leaving the alley. Jackson acknowledged his earlier testimony, but explained that he was young, confused and nervous at the time. Jackson stated that he knew Darrius and [Johnson] were the shooters, but he did not know which of them shot the baby.

Tomtieja Bates testified that he was the driver on the night of the shooting and that he drove to Lillian Street because Darrius had said he wanted to "holler at My Pooh." Bates stated that Mario, Darrius, and [Johnson] got out of the car, that he saw all three walk down the alley, and that he then heard gunfire that sounded like it came from an assault rifle. Although he did not remember whether [Johnson] and Mario returned with guns, Bates testified to seeing both [Johnson] and Darrius with guns when he dropped them off at Mario's house. Bates acknowledged that he was the owner of one of the assault rifles that were in his car that night.

*State v. Johnson*, 48,325 (La. App. 2 Cir. 9/18/13), 135 So.3d 705, 707–09.

Johnson was convicted of second-degree murder and sentenced to life imprisonment. *Id.*, *writ denied*, 2013-2451 (La. 4/11/14), 137 So. 3d 1213. His conviction and sentence were affirmed on appeal. *Id.*

4

Johnson filed an application for post-conviction relief, which was denied by Judge O'Callaghan. ECF No. 1-3 at 1. Johnson sought writs in the Louisiana Second Circuit Court of Appeal and the Louisiana Supreme Court, arguing that Judge O'Callaghan should have recused himself because he had been involved in Johnson's case while serving as an assistant district attorney. The Louisiana Supreme Court granted the writ and remanded the case for reallotment and consideration. *State ex rel. Johnson v. State*, 2015-1991 (La. 2/24/17).

After being reassigned and considered by a new judge, the application was denied. ECF No. 1-3 at 1-5. Johnson sought writs in the appellate court, which were denied on the showing made. ECF No. 1-3 at 7. The Louisiana Supreme Court also denied writs. *State ex rel. Johnson v. State*, 2017-1527 (La. 11/20/18), 256 So. 3d 985.

In his § 2254 Petition, Johnson claims that there was insufficient evidence to convict him, that the trial court erred in sustaining the State's "reverse-*Batson*" challenge, and that counsel was ineffective for failing to call alibi witnesses and failing to object to the jury instructions. ECF Nos. 1, 7. Johnson also raised an ineffective assistance claim regarding jury selection, which has been dismissed. ECF No. 9.

II.    **Law and Analysis**

    A.    **Rule 8(a) Resolution**

The Court is able to resolve Johnson's § 2254 Petition without the necessity of an evidentiary hearing because there are no genuine issues of material fact relevant to Johnson's claims, and the state court records provide an adequate factual basis.

*See Moya v. Estelle*, 696 F.2d 329, 332-33 (5th Cir. 1983); *Easter v. Estelle*, 609 F.2d 756, 761 (5th Cir. 1980); Rules Governing Section 2254 Cases.

### B.   Johnson's sufficiency of the evidence claim was not fully exhausted and is now procedurally defaulted.

After his appeal was filed, Johnson filed a supplemental *pro se* brief claiming there was insufficient evidence to convict him of second-degree murder.  ECF No. 18-10 at 199-203.  The appellate court found there was sufficient evidence to support the conviction under *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See Johnson*, 135 So.3d at 709.

Johnson filed a writ application in the Louisiana Supreme Court raising claims regarding jury selection, disclosure of material evidence, and admission of evidence of other crimes at trial.  ECF No. 18-11 at 8-9.  The writ application did not raise the claim of insufficient evidence.  ECF No. 18-11 at 3-17.  Johnson claims that he mailed a supplemental brief raising the claim on October 15, 2013.  ECF No. 19.  However, according to the record, the document postmarked October 15, 2013 was Johnson's original writ application, not a supplement.  ECF No. 18-11 at 2.  The Court also confirmed that no supplemental brief was filed.  Because Johnson did not fairly present his claim in every appropriate state court, the claim is not exhausted.  28 U.S.C. §2254(b)(1)(a).

An unexhausted claim may be considered "technically exhausted" when a petitioner can no longer litigate the claim in state court.  28 U.S.C. §2254(c).  That is, when a petitioner has failed to exhaust state remedies, and the state court to which he would be required to present his claim to satisfy the exhaustion requirement would

now find the claim procedurally barred, the petitioner's claim is in procedural default for purposes of federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Johnson's insufficient evidence claim is procedurally defaulted because Johnson failed to raise the claim in the Louisiana Supreme Court, and the claim would be procedurally barred if he attempted to present it now. *See* Louisiana Supreme Court Rule X, §5(a). A new post-conviction application would also be untimely. *See* La. C. Cr. P. art. 930.8; *Williams v. Department of Corrections*, 444 F. Appx. 833 (5th Cir. 2011) (finding dismissal as untimely under art. 930.8 is an independent and adequate state procedural bar).

A habeas petitioner can overcome a procedural default by showing cause and actual prejudice for his default, or demonstrating that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997). To establish cause, the petitioner must show that some external, objective factor impeded his efforts to raise the claim in a procedurally proper manner. "Examples of external impediments include active governmental interference or the reasonable unavailability of the factual or legal basis for the claim." *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citing *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)) (internal quotations omitted).

Johnson does not allege, and nothing in the record suggests, any external factor that prevented Johnson from including the insufficient evidence claim in his writ

application to the Louisiana Supreme Court. "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)). Having failed to show an objective cause for his default, a determination regarding prejudice need not be made. *Ratcliff v. Estelle*, 597 F.2d 474 (5th Cir. 1979) (citing *Lumpkin v. Ricketts*, 551 F.2d 680, 681–82 (5th Cir. 1977)).

A finding of fundamental miscarriage of justice depends on a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 434 (1986); *Murray v. Carrier*, 477 U.S. 478, 496; *Glover*, 128 F.3d 900, 902 (5th Cir. 1997). To satisfy the factual innocence standard, a petitioner must "support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence. *See id.*

Johnson presents no new evidence indicating his innocence. Johnson does not show that, as a factual matter, he did not commit the crime. *Id.*; *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995). Thus, his insufficient evidence claim should be denied and dismissed.

C.    **Johnson is not entitled to habeas relief on his *Batson* claim.**

Johnson alleges that he is entitled to habeas relief under § 2254(d)(1) and (2) for the state court's finding regarding discriminatory intent in peremptory challenges.  ECF No. 1-2 at 9.  Under § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim unless the adjudication has: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362 (2000)).  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case."  *Id.* at 741.  Factual findings by the state court are presumed correct unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. §2254(e)(1).

A party's racially discriminatory use of peremptory challenges violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that Equal Protection Clause applies to the prosecution's use of peremptory challenges); *Georgia v. McCollum*, 505 U.S. 42, 46 (1992) (applying *Batson* to a criminal defendant's use of racially discriminatory peremptory challenges). A court evaluating a reverse-*Batson* challenge applies a three-part test:

> First, the [moving party] must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Second, once the [moving party] has made out a prima facie case, "the burden shifts to the [non-moving party] to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination."

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal citations and quotation marks omitted). The party opposing a strike bears the burden of persuasion regarding the striking party's racial motivation. *Davis v. Ayala*, 576 U.S. 257, 271 (2015).

Johnson alleges that the trial court unreasonably applied *Batson* to the facts of his case by merging the second and third steps of the *Batson* inquiry improperly shifted the burden of persuasion. ECF No. 1-2 at 12. The State argues that there was no merging of the second and third steps of the *Batson* inquiry in this matter, and the burden of persuasion never shifted to the defense. Rather, the prosecutor presented arguments to the trial court indicating that the defense attorney's stated race-neutral reasons for striking prospective jurors were pretexts. ECF No. 18-1 at 29-30.

The trial court denied the reverse-*Batson* challenges as to six potential jurors, and granted as to two jurors. According to the Second Circuit:

> In the present case, following a number of peremptory challenges by the defense during jury selection, the state noted to the court that all five of the defense challenges had been used to strike Caucasians, but did not object at the time. After the next round of peremptory challenges, the state made a reverse *Batson* objection asserting that [Johnson's] use of challenges showed a pattern of racial discrimination against potential Caucasian jurors. At that point, the court noted:

>> Based on the numbers of challenges exercised, that being eight of ten for Caucasians, and based on the fact that the state has previously made defense counsel and the court aware . . . with regard to any *Batson* issues, the Court does find that there is a prima facie showing, and at this time will ask defense counsel to give race-neutral reasons for their exercise of peremptory challenges.

> In providing race-neutral reasons for striking potential juror Adam Beasley, the defense counsel stated:

>> Your Honor, we challenged Mr. Beasley because, simply for the fact that he and Mr. Cox seemed to have a special relation in the questioning, in that Mr. Cox talked a lot about some old movie theater goings on, and I just felt they had a special connection, and so we challenged him for that reason.

> The court then asked for the state's response. The prosecutor replied that he had asked Beasley about his background in television and whether he recalled a local program that was broadcast many years ago. The state asserted there was "no special relationship there. None of his answers suggested any favoritism to one side or the other." At that point, the court stated that it would re-visit the challenge to Beasley.

> Continuing his reasons, defense counsel stated that potential juror Steven Nicholson was excused because he "has small boys. I believe he is one of the only jurors that has small kids." In opposition, the state replied that several black jurors, who were also parents of young children, were not similarly challenged by [Johnson]. After considering the voir dire responses of other potential jurors, the court issued the following ruling:

11

The Court: ... The Court finds that based on the fact that defense counsel did not exercise a peremptory strike with regard to Taffanie Lewis a black female who testified she had two children, one age six and one age seven, and in contrast the defense counsel said they exercised a peremptory strike with regard to Steven Nicholson because he had two children, age eight and age nine, the Court finds that that is not a race-neutral reason. The Court finds that the defense counsel exercised a peremptory strike with regard to Mr. Nicholson for reasons other than race neutral when compared to the fact that an African American female who had two children, ages six and seven was kept by the defense counsel. So the Court does not find defense counsel's reasoning with regard to Mr. Nicholson, or does not find defense counsel's argument with regard to Mr. Nicholson to be race-neutral. Are there any other reasons, Mr. Thomas, why you exercised a peremptory strike with regard to Steven Nicholson?

Mr. Thomas: No, Your Honor, just note my objection.

The Court: The Court finds that there is violation of reverse *Batson*, and that is McCollum with regard to Steven Nicholson. The Court also cites a recent Louisiana Supreme Court opinion in which this Court was reversed on this, a very similar issue in the case of *State v. James Mason*.

Returning to the challenge of Beasley, the court repeated [Johnson]'s race-neutral explanation and asked for the state's response. The state replied that in answer to questioning, Beasley had simply said he remembered an old television program. The prosecutor stated that he had never met Beasley before and denied that their shared memory created a special relationship. The trial court then issued its ruling:

Well, the court will note for the record that Mr. Cox, as other attorneys do from time to time, will get into questions concerning just the background and the hobbies of prospective jurors.... I would note that Mr. Cox typically does that, and ... that's what Mr. Cox was doing in that with regard to Mr. Beasley, as Mr. Cox did with, for example, Ms. Hart, who is a young black female, 24 years of age, Mr. Cox asked Ms. Hart several questions concerning her hobbies on singing, joked with her as to whether she knew Bobby Darin and things of that nature. And frankly, Mr. Cox was, seemed to build a nice rapport with Ms. Hart....

> So we could go through several examples of Mr. Cox joking with the prospective jurors in a very similar manner as he did with Mr. Beasley regarding the old KTBS shows that far predate me. So for those reasons the Court does not find that the defense counsel has articulated a race-neutral reason for excusing Mr. Alan Beasley.... It is a very difficult issue to tackle, particularly for District Court judges to make that call as we are sitting here. But we do sit here, and we see things that do not make the record ... Having said that, the Court finds that the defense counsel has failed to give race-neutral reasons with regard to juror Steven Nicholson, a white male, and with regard to Alan Beasley, a white male. With regard [to] all of the other prospective jurors, the Court does find that the defense did give race-neutral reasons for the exercise of the peremptory challenges.

Citing *Nelson, supra*, [Johnson] contends the trial court erred in shifting the burden of proof to him with regard to his peremptory challenges of prospective jurors Nicholson and Beasley. However, the situation in this case can be distinguished from that of *Nelson*, in which the court heard and rejected *Nelson*'s race-neutral reasons for the peremptory challenges on the basis that they failed to rebut the state's prima facie showing of discrimination. Here, unlike the situation in *Nelson*, the trial court heard [Johnson]'s race-neutral explanations for striking Nicholson and Beasley and then, before ruling, proceeded to the third step of *Batson* by requiring the state to present factual circumstances demonstrating that those peremptory challenges were made with discriminatory intent.

Considering [Johnson]'s argument, we note that the trial court may have created confusion by expressing its ruling on the state's *Batson* challenge as a finding that [Johnson] failed to give race-neutral reasons for striking prospective jurors Nicholson and Beasley. The record shows that [Johnson] did provide race-neutral reasons, which the trial court then assessed and found unpersuasive in those two instances.  In performing the third step of the *Batson* inquiry, the court effectively found that [Johnson]'s race-neutral explanations for striking those jurors were a pretext based on evidence of the [Johnson]'s discriminatory intent presented by the state.

In determining whether the state carried its burden of proving purposeful discrimination, the trial court found that the interaction between the prosecutor and Beasley did not indicate a special relationship when compared to the rapport between the prosecutor and some black potential jurors who were not similarly stricken by

[Johnson]. Regarding Nicholson, the court pointed out that [Johnson] did not similarly strike a black potential juror who was also a parent of young children. If a party's proffered reason for striking a person of one race from the jury applies just as well to a person of another race who is permitted to serve, then that fact is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step. *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005); *State v. Sparks*, 1988–0017 (La.5/11/11), 68 So.3d 435.

Here, the state pointed out to the trial court that [Johnson]'s proffered reasons for striking white potential jurors Beasley and Nicholson were equally applicable to several nonwhite potential jurors who were not stricken by [Johnson]. Based upon the evidence presented and applying the *Batson* analysis to the circumstances of this case, we cannot say the trial court erred in concluding that the state satisfied its burden of proving that [Johnson] acted with discriminatory intent in his peremptory challenges of Beasley and Nicholson.

*Johnson*, 135 So.3d at 712–13.

The trial court found that the prosecution satisfied the prima facie showing in accordance with the first step of the *Batson* inquiry.  ECF No. 18-8 at 164-166.  At the second step, the defense provided race-neutral reasons for eight challenged jurors.  ECF No. 18-8 at 165-187.  Johnson's attorney argued that he felt that Mr. Beasley and the prosecution seemed to have a "special connection."  ECF No. 18-8 at 168.  The race-neutral reason proffered by Johnson's attorney for Mr. Nicholson was that "he has small boys."  ECF No. 18-8 at 171.

After hearing Johnson's explanations, the court proceeded to the third step of *Batson* by requiring the state to present factual circumstances demonstrating that peremptory challenges were made with discriminatory intent.  The prosecutor pointed out that the proffered reasons for striking Mr. Beasley and Mr. Nicholson were equally applicable to several nonwhite potential jurors that Johnson did not

strike.  In performing the third step of the inquiry, the trial court found that the prosecution proved purposeful racial discrimination as to Mr. Beasley and Mr. Nicholson.  ECF No. 18-8 at 175-176; 185.  The trial judge did not merge the steps or shift the burden of persuasion onto Johnson.

Johnson does not show that the adjudication of his claim by the state court was contrary to or involved an unreasonable application of *Batson* or its progeny, or that the state court adjudication was based on an unreasonable determination of the facts in light of the evidence presented in the state proceedings.   Johnson's argument is not supported by the record, which shows a rigorous and thorough examination of the *Batson* steps.

### D.    Johnson does not establish ineffective assistance of counsel.

Johnson claims that he received ineffective assistance of counsel in violation of the Sixth Amendment when his trial counsel failed to investigate or call his alibi witnesses to testify, and failed to object to erroneous jury instructions and the prosecution's argument on the law of principals[1].  ECF No. 1-2 at 15-22.

The state courts denied relief, finding that Johnson failed to show he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  ECF No. 18-12 at 225.  Because Johnson's ineffective assistance claims were adjudicated on the merits in state court, he must show that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of" *Strickland*, which is the "clearly established Federal

_____

[1] Johnson raised another unexhausted ineffective assistance of counsel claim, which has been denied and dismissed as procedurally defaulted.

law, as determined by the Supreme Court" applicable to ineffective assistance claims. 28 U.S.C. §2254(d)(1); *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009).

To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate: (1) that his counsel's performance was deficient, requiring a showing that the errors were so serious such that he failed to function as "counsel" as guaranteed by the Sixth Amendment; and (2) that the deficiency so prejudiced the defendant that it deprived him of a fair trial. *Strickland*, 466 U.S. at 687. The first prong does not require perfect assistance by counsel; rather, a petitioner must demonstrate that counsel's representation fell beneath an objective standard of reasonableness. *Id.* at 688.

Courts must use deference in their review of attorney performance under *Strickland* to "eliminate the potential distorting effect of hindsight." *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 689). Accordingly, courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

*Strickland*'s second prong requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In other words, the petitioner must show prejudice great enough to create a substantial—rather than conceivable—likelihood of a different result. *See Pape v. Thaler*, 645 F.3d 281, 288

(5th Cir. 2011). "Both of [Strickland's] prongs must be proven, and the failure to prove one of them will defeat the claim, making it unnecessary to examine the other prong." *Williams v. Stephens*, 761 F.3d 561, 566–67 (5th Cir. 2014).

This Court must review Johnson's ineffective assistance claim under a "doubly deferential" standard of *Strickland* and § 2254(d). *See Cullen v. Pinholster*, 563 U.S. 170, 190, 202 (2011); *see also Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017) ("Our federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is 'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)."). That is, on habeas review, "federal courts are to afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quotation marks omitted).

### 1.    Failure to Investigate or Call Alibi Witnesses

Johnson claims that he provided his attorney with the names of three alibi witnesses, and the witnesses were sworn under the rule of sequestration on the first day of trial. ECF No. 1-2 at 16-17. Johnson alleges that his attorney failed to call these witnesses to testify because he was unprepared and had failed to interview them prior to trial. *Id.* Johnson asserts this was deficient performance and there is a reasonable probability that, had the witnesses testified, he would not have been convicted.

In the Fifth Circuit, complaints of uncalled witnesses are disfavored "because the presentation of testimonial evidence is a matter of trial strategy and because

allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). The presentation of testimony is generally a matter of trial strategy, and is within trial counsel's domain. *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010), *cert. denied*, 562 U.S. 911 (2010). To succeed on the claim, Johnson must show that, had counsel interviewed and called these witnesses, their testimony would have been favorable. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Still, "[i]t is not enough to show that the jury could have reached a different result. [The petitioner] must show it was "reasonably likely" they would have." *Sanchez v. Davis*, 936 F.3d 300, 306 (5th Cir. 2019).

When Johnson raised this claim on post-conviction review, he attached affidavits from the three alleged alibi witnesses that were sworn and signed in 2014, two years after the trial and six years after the shooting. Two of the witnesses are Johnson's relatives. Johnson's sister, Andrea Johnson, states that Johnson was at her home between 10:00 and 10:30 p.m. when she left the residence on August 29, 2008. ECF No, 18-11 at 127. When she returned at midnight, she reportedly saw Johnson in bed. *Id.* Andrea Johnson further states that she was awake until 3:00 a.m., and no one left the house while she was awake. *Id.*

Andrea Johnson's partially paralyzed son, Rommel Johnson, signed an affidavit stating that, on the night of the murder, Johnson was "taking care" of him and "was in and out of [Rommel Johnson's] bedroom that night every time [Rommel] needed his assistance." ECF No. 18-11 at 129. However, Rommel Johnson did not

attest to seeing Johnson at any specific times.  An affidavit of a neighbor, Reginald Brooks, states that he saw Johnson "walking up to his residence" at around 9:00 p.m. on August 29, 2008, as Brooks was leaving.  ECF No. 18-11 at 128.

According to the record, the shooting happened at around 3:30 a.m., which is subsequent to any of the times provided in the affidavits of the alleged alibi witnesses. ECF No. 18-3 at 71.  And contrary to the affidavits, four witnesses testified at trial that Jackson was seen with a gun at or near the time of the shooting.  *Johnson*, 135 So.3d at 707.  Additionally, the affidavits all state what the affiants would purportedly testify to in 2014, but do not indicate whether they would have testified as such at the time of trial.  Moreover, the two affidavits from Johnson's close relatives and are "inherently suspect."  *See Cole v. Vannoy*, 2020 WL 520614, at *11 (E.D. La. 2020) (citing *Milton v. Secretary, Department of Corrections*, 347 F. App'x 528, 531 (11th Cir. 2009) (finding the reliability of petitioner's affidavits suspect because they were executed by relatives).  The affidavits do not establish a reasonable likelihood that the jury would have reached a different result.

Furthermore, Johnson's claim that his attorney failed to investigate witnesses is belied by the attorney's filing of a notice of alibi prior to trial indicating that Andrea and Rommell Johnson may testify.  ECF No. 18-6 at 228.  Ultimately, the defense did not call these witnesses, presumably as a matter of trial strategy.  When the defense announced that it was not calling the witnesses and that Johnson would not testify, Johnson indicated that he had a question for his attorney.  ECF No. 18-10 at 80-82. The trial judge gave Johnson time to confer with his attorney, after which Johnson

indicated that he was satisfied.  *Id.* at 81.  Johnson voiced no complaint to the court about his attorney not calling his alleged alibi witnesses to testify.  *Id.*  Johnson has not overcome the strong presumption that his attorney's conduct falls within a wide range of reasonable professional assistance.

Nor has Johnson shown that the state courts unreasonably applied *Strickland*. The trial court noted that Johnson made conclusory statements regarding what testimony would have been given at trial and failed to prove that the alibi witnesses' testimony would have resulted in a different outcome at trial.  ECF No. 18-12 at 88. This denial is not an unreasonable application of *Strickland* in light of the testimony and affidavits.

## 2. Failure to Object

Johnson also claims that his attorney failed to object to an incorrect jury instruction, and to the prosecutor's closing argument, on the law of principals to a crime.  ECF No. 1-2 at 21.  Johnson asserts that the erroneous instruction and argument relieved the state of its burden of proving specific intent to kill.  He suggests that his attorney's failure to object and the erroneous instruction meant that the state merely had to prove he was at the scene when the killing took place for the jury to convict him.  *Id.*

Johnson cites *Flowers v. Blackburn*, 779 F.2d 1115 (5th Cir. 1986), *cert. denied*, 475 U.S. 1132 (1986), which centered upon the following instruction: "All persons knowing the unlawful intent of the person committing the crime who were present consenting thereto, and aiding and abetting . . . are principals and equal offenders

and subject to the same punishment." *Flowers*, 779 F.2d at 1117.  The Fifth Circuit determined that the instruction as a whole relieved the state of its burden of proving that the defendant had specific intent to kill. *Id.* The instructions in Johnson's case did not relieve the state of its burden to prove Johnson's specific intent to kill, and did not include language indicating that merely knowing another's unlawful intent and being present for a crime would suffice.

The judge instructed the jury that Johnson was charged with committing second-degree murder, and that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals."  ECF No. 18-12 at 66-67.  This definition of principals comes from La. R.S. 14:24.   The instruction did not relieve the prosecution of its burden of proof.   In fact, the judge went on to state that the jury "may not infer that the defendant is guilty of participating in criminal conduct merely from the fact that he was present at the time the crime was being committed."  *Id.* at 67.

The judge instructed that second-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.  *Id.*  He defined specific criminal intent as the "state of mind which exist [sic] when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure to act."  ECF No. 18-12 at 69.  The judge then

explained that specific intent can be inferred from the circumstances as long as the circumstantial evidence excludes every reasonable hypothesis of innocence. *Id.*

> Specifically, he instructed the jury as follows:
>
> When a person shoots at one person with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting great bodily harm would have been unlawful against the first person, then it would be unlawful against the person actually shot, even though that person was not the intended victim. A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable.
>
> Whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence, and the defendant may be convicted as a principal to the crime.

ECF No. 18-12 at 70. The instructions emphasized that specific intent was required to convict for second-degree murder and that a conviction could not rest on Johnson's mere presence when the crime was committed.

In closing argument, the prosecutor stressed that Johnson had specific intent to kill someone, and that a baby ended up being killed. The prosecutor emphasized that there was "no doubt" that the requisite specific intent was present, and then went on to address the concepts of transferred intent and principals with the jury. The argument did not suggest that the jury did not need to find specific intent. The prosecutor asserted that specific intent was clear from the circumstances established by the evidence. ECF No 18-11 at 176-178.

Even though Johnson complains about both the jury instruction and the prosecution's closing argument, the jury was instructed that "statements and

arguments made by the attorneys at any time during trial are not evidence." ECF No. 18-11 at 162. The jury instructions were not incorrect and did not "water down" the state's burden of proof. ECF No. 1-2 at 21.

Even if the jury instruction was erroneous, such errors are subject to harmless error analysis. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Robertson v. Cain*, 324 F.3d 297, 306-07 (5th Cir. 2003). Thus, a federal court may grant habeas relief only if the constitutional error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631. The verdict is well-supported by evidence, including three witnesses that testified that Johnson was at the scene of the crime with a gun. Evidence recovered from an alley near the residence established that over 20 shots were fired at the house from assault-type weapons, and forensic analysis could not exclude the possibility that there were two shooters. Therefore, the explanation of principals, even if erroneous, would have been harmless error.

Since there was no error in the jury instruction, there was no reason for Johnson's attorney to object. The failure to raise a meritless objection cannot constitute ineffective assistance of counsel. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994), *cert. denied*, 513 U.S. 966 (1994). Johnson's allegation that the result of the trial would have been different if his attorney had objected is conclusory and speculative, and thus cannot satisfy *Strickland*. *United States v. Woods*, 870 F.2d 285, 288 n.3 (5th Cir. 1989).

As the judge stated in denying post-conviction relief, "[t]he record shows that the jury instructions provided a correct explanation regarding who may or may not be a principal, as the language was drawn directly from the statute." ECF No. 18-12 at 143. The judge pointed out that the jury instructions also included an explanation of intent as it relates to the charge of second-degree murder. *Id.* This ruling does not unreasonably apply federal law, so Johnson cannot meet the requirements of § 2254(b).

## III.  Conclusion

Because Johnson's insufficient evidence claim is procedurally defaulted, and he does not establish a *Batson* violation or that he received ineffective assistance of counsel, IT IS RECOMMENDED that Johnson's Petition (ECF No. 1) and Amended Petition (ECF No. 7) be DENIED and DISMISSED WITH PREJUDICE.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a circuit justice or district judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within 14 days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2).  A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Thursday, August 12, 2021.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE